Estate of William V. SCHELBERG, Sarah J. Schelberg, Executrix, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 3, Docket 78–4192.

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1979.

Decided Oct. 29, 1979.

John M. Vine, Washington, D. C. (John B. Jones, Jr., Washington, D. C., of counsel), for petitioner-appellant.

David I. Pincus, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal by a taxpayer from a decision of the Tax Court, 70 T.C. 690 (1978), raises a serious question with respect to the interpretation of § 2039, which was added to the Internal Revenue Code in 1954.[1]

---

1. This reads in pertinent part as follows:

§ 2039. Annuities

(a) General.—The gross estate shall include the value of an annuity or other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement entered into after March 3, 1931 (other than as insurance under policies on the life of the decedent), if, under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death.

(b) Amount includible.—Subsection (a) shall apply to only such part of the value of the annuity or other payment receivable under such contract or agreement as is proportionate to that part of the purchase price therefor contributed by the decedent. For purposes of this section, any contribution by the decedent's employer or former employer to the purchase price of such contract or agreement (whether or not to an employee's trust or fund forming part of a pension, annuity, retirement, bonus or profit sharing plan) shall be considered to be contributed by the decedent if made by reason of his employment.

(c) Exemption of annuities under certain trusts and plans.—Notwithstanding the provisions of this section or of any provision of law, there shall be excluded from the gross estate the value of an annuity or other payment receivable by any beneficiary (other than the executor) under—

(1) an employees' trust (or under a contract purchased by an employees' trust) forming part of a pension, stock bonus, or

## I.

Decedent William V. Schelberg was born on March 14, 1914 and died on January 6, 1974 from lung cancer after a week's illness. He was survived by his wife, Sarah, and two daughters, one aged 23 and the other 19. He had been employed by International Business Machines Corp. (IBM) since 1952. At his death he was serving as assistant director of international patent operations at a salary of $4,250 per month.

IBM maintained a variety of employee benefit plans, each adopted at a different time and separately administered. Those here relevant are the Group Life Insurance Plan, the Retirement Plan, the Sickness and Accident Income Plan, and the Total and Permanent Disability Plan. Schelberg was entitled to participate in each.

The Group Life Insurance Plan provided two basic benefits—a group term life insurance, which is not here at issue,[2] and an uninsured and unfunded survivors income benefit, which is. This benefit, determined on the basis of the employee's compensation at the time of death and the amount of the aforementioned life insurance, was payable to a decedent's "eligible" survivors in an order of preference stated in the plan. Payment was to be made monthly, at the rate of one-quarter of the decedent's regular monthly compensation, until the total benefit was exhausted. Payments continued only so long as at·least one eligible survivor remained.

The Retirement Plan was a qualified pension plan under I.R.C. § 401. Under IBM's general employment policy, Schelberg would have been required to retire at age 65 and would have been entitled to the retirement benefits provided in the plan.

Under the Sickness and Accident Plan all regular IBM employees were entitled to receive full salary (reduced by any workmen's compensation payments) while absent from work on account of sickness or accident for up to 52 weeks in any 24-month period. Benefits could be continued for more than 52 weeks at IBM's discretion in individual cases; these were known as "individual consideration" benefits.

The Disability Plan covered all IBM employees with more than five years' service. Eligibility was based on determination of "total and permanent disability" by a corporate panel on the basis of medical evidence. The quoted phrase was defined to mean that the employee was unable to perform any employment for pay or profit and had no reasonable expectation of becoming able to do so. Benefits were calculated on the basis of the employee's regular compensation prior to disability, taking account of eligibility for Social Security payments and workmen's compensation. They began on the expiration of the 52-week period of Sickness and Accident benefits plus any period of individual consideration benefits and continued until normal retirement date, at which time the employee became eligible for benefits under the Retirement Plan.[3]

profit-sharing plan which, at the time of the decedent's separation from employment (whether by death or otherwise), or at the time of termination of the plan if earlier, met the requirements of section 401(a);

(2) a retirement annuity contract purchased by an employer (and not by an employees' trust) pursuant to a plan which, at the time of decedent's separation from employment (by death or otherwise), or at the time of termination of the plan if earlier, was a plan described in section 403(a);

(3) a retirement annuity contract purchased for an employee by an employer which is an organization referred to in section 170(b)(1)(A)(ii) or (vi), or which is a religious organization (other than a trust), and which is exempt from tax under section 501(a); or

(4) chapter 73 of title 10 of the United States Code.

**2.** Section 2039(a) is expressly inapplicable to payments receivable "as insurance on the life of the decedent". .

**3.** Disability benefits began at 75% of regular compensation and continued at that rate for the first 18 months less any period during which the employee had received "individual consideration" benefits under the Sickness and Accident Plan. Thereafter the benefits were the greater of 40% of regular compensation at the time of disability or accrued retirement income under the Retirement Plan based on actual service and imputed earnings during the receipt of payments under the Sickness and Accident Plan, with an upward adjustment for

During the period of disability an employee remained covered by a variety of other IBM employee plans[4] and could, under certain conditions, accrue further credits under the Retirement Plan.[5] If, contrary to expectation, the employee became able to work again, he was entitled to return, but few did so. As of January 1, 1974, a total of 393 IBM employees out of 150,000 were receiving benefits under the Disability Plan.

At the time of his death Schelberg was not receiving benefits under any of these plans. By virtue of his decease his widow became entitled under the Group Life Insurance Plan to a death benefit of $23,666.67 under the group life insurance policy, and to a surviviors benefit of $1,062.50 per month. The value of the latter amount was not included in decedent's gross estate in his federal estate tax return, although its existence was reported. The Commissioner of Internal Revenue entered a notice of deficiency on the sole ground that the present value of the survivors annuity, which is stipulated to have been $94,708.83, was includible in the estate pursuant to I.R.C. § 2039, see note 1 *supra*. The Tax Court upheld the Commissioner in a considered but somewhat *dubitante* opinion by Judge Raum, see 70 T.C. at 705 and *infra,* and the estate has appealed.

## II.

The estate does not dispute that the survivors benefit constituted "an annuity or other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement entered into after March 3, 1931 (other than as insurance under policies on the life of the

decedent)" within the opening clause of § 2039(a). It is likewise indisputable that this alone would not suffice to make the survivors benefit includible in the gross estate. The Commissioner must also satisfy the condition that "under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death."

Not contending that he can satisfy this requirement within the four corners of the Group Life Insurance Plan, the Commissioner asserts that, as provided by the Treasury Regulations, 26 C.F.R. § 20.2039–1(b), he is entitled to consider "any arrangement, understanding or plan, or any combination of arrangements or plans arising by reason of the decedent's employment". Although this is a rather sharp departure from the letter of the statute, see Pincus, Estate Taxation of Annuities and Other Payments, 44 Va.L.Rev. 857, 868–69 (1958), we accept it with the *caveat* that while the Commissioner is entitled to "consider" such arrangements, this does not mean that the mere possibility of an employee's receiving some benefit under an arrangement other than that giving rise to the survivors benefit necessarily satisfies the condition of § 2039(a). The Commissioner does not rely on either the Retirement Plan or the Sickness and Accident Plan to satisfy the condition that "an annuity or other payment" was payable to Schelberg. Apart from other considerations, any such reliance is pre-

employees disabled before attaining age 55. See note 5, *infra*.

4. These included the Family Hospitalization Plan, the Major Medical Plan, the Dental Plan, the Medical Plans with Medicare, the Special Care for Children Assistance Plan, the Adoption Assistance Plan and various educational benefit plans.

5. The Tax Court stated in its findings that "[t]he period of disability payments was not considered service with IBM for purposes of the Retirement Plan." 70 T.C. at 695. It relied

at least in part on this finding in linking the Disability Plan with the Retirement Plan as a post-employment benefit, rather than linking it with the Sickness and Accident Plan, under which service credits continue to accrue, as a wage continuation benefit. See *id.* at 701–02. The Retirement Plan specifically provides in Article 11(E), however, that employees receiving benefits under the Disability Plan would continue to accrue service credits until age fifty-five. There is a provision to the same effect in the Disability Plan.

cluded by previous revenue rulings.[6] Revenue Ruling 76–380, 1976–2 C.B. 270, concluded that qualified plans, like the Retirement Plan, and non-qualified plans, like the Survivors Income Benefit Plan, were not to be considered together in determining the applicability of § 2039(a) and (b). See also *Estate of Brooks v. C. I. R.,* 50 T.C. 585, 594–95 (1968).[7] Revenue Ruling 77–183, 1977–1 C.B. 274, held that benefits such as those Schelberg might have been entitled to under the Sickness and Accident Plan had he lived longer "were in the nature of compensation" and thus no more meet the test set out in the condition than would compensation payments themselves, *Estate of Fusz v. C. I. R.,* 46 T.C. 214 (1966), acq. 1967–2 C.B. 2; see also *Kramer v. United States,* 406 F.2d 1363, 186 Ct.Cl. 684 (1969). This left as the Commissioner's sole reed the fact that, at the time of his death, Schelberg possessed the right that after 52 weeks (or more if he qualified for "individual consideration") under the Sickness and Accident Plan, he might become entitled to payments under the Disability Plan. The estate contends that Schelberg's rights under the Disability Plan were too dissimilar in nature from an "annuity or other payment" and too contingent to meet the condition of § 2039(a). We agree.

It is worth repeating that the Commissioner's position here would apply to every IBM employee having more than five years' service who dies before attaining age 64 (or taking early retirement) although he neither received nor had any reasonable expectation of receiving anything under the Disability Plan. On the other hand, if he died after attaining age 64 but before taking retirement, the survivors benefit would not be includible since the first twelve months away from work would be covered by the Sickness and Accident Plan and he could never become eligible for the Disabili-

ty Plan. And, of course, if he died after actually taking retirement, the most common case, the survivors benefit would not be includible by virtue of Revenue Ruling 76–380, 1976–2 C.B. 270. We find nothing in the language of § 2039, in its legislative history, or in the Treasury Regulations sufficient to justify a conclusion that the action of an employer in creating a plan whereby a handful of employees can receive disability benefits because of a rare health or accident syndrome should bring the survivors of all within § 2039.

As recognized by a learned commentator shortly after § 2039 was enacted, the statute was aimed at "annuity contracts under which the purchaser (alone or with a joint annuitant) was entitled to payments for his life, with payments to continue after his death, at either the same or a reduced rate, to a survivor." Bittker, Estate and Gift Taxation under the 1954 Code: The Principal Changes, 29 Tul.L.Rev. 453, 469 (1955). While inclusion of the survivor's rights in the estate had been generally sustained, courts had differed as to the reason. Some courts had proceeded on the theory that purchase of the contract was in effect a transfer of property with the reservation of a life estate and thus taxable under the predecessors of I.R.C. § 2036. Others had proceeded on the theory that the transfer was intended to take effect at death. *Id.* A fundamental purpose of § 2039 was to supply an affirmative answer to the question of inclusion in such cases without further need to debate the theory.

A further purpose, as revealed by the relevant House and Senate Committee reports on what became § 2039 of the revised I.R.C. of 1954, H.R.Rep.No.1337, 83d Cong. 2d Sess. 90–91, A 314–6 (1954); S.Rep.No. 1622, 83d Cong. 2d Sess. 123–24, 469–72 (1954); H.R.Rep.No.2543 (Conference Report), 83d Cong. 2d Sess. 74 (1954), U.S.Code

---

**6.** Both of the Revenue Rulings clearly cover the IBM plans in question; indeed, it appears that the rulings were based on the IBM plans themselves.

**7.** The Commissioner reached this result primarily in reliance on the parenthetical language in

Regs. 20.2039–1(b)(2), example (6), quoted *infra.* The language of § 2039(c) itself, providing that annuities or payments receivable by a beneficiary pursuant to qualified plans were excludable from the gross estate, does not seem to lead inexorably to such a conclusion.

Cong. & Admin.News 1954, p. 4017, was to settle the question of includibility of a joint and survivor annuity where the annuity was purchased by the decedent's employer or both the decedent and the employer made contributions. Congress decided that such an annuity should be included except when the employer's contributions were made pursuant to "an approved trust, pension or retirement plan."

Both text and context show that § 2039 was conceived as dealing only with the problem of what in substance was a joint annuity, although to be sure in all its various ramifications, not with the whole gamut of arrangements under which an employee, his employer or both may create benefits for the employee's survivors. The new section applied only "if, under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does

not in fact end before his death." If Congress had wished to legislate more broadly, it would have eliminated this clause or chosen more general language for it. The intended sphere of application is made quite clear by the illustrations given in the House and Senate reports "as examples of contracts, but . . . not necessarily the only forms of contracts to which this section applies." [8] Under all of these the decedent was receiving or entitled to receive at death what anyone would consider an "annuity or other payment" for the duration of his life or for a stipulated term.[9] Furthermore, in each case the beneficiary succeeded to the interest of the decedent, as in the classic instance of a joint and survivor annuity, quite unlike the present case. Although the term "other payment" is literally broad, Congress was clearly thinking of payments in the nature of annuities—the same types of payments which, if made to the survivor, would be includible in the estate. See *Estate of Fusz, supra*, 46 T.C. at 217. None of the examples is even close to payments receivable only if the deceased employee

---

**8.** (1) A contract under which the decedent immediately before his death was receiving or was entitled to receive for the duration of his life an annuity, or other stipulated payment, with payments thereunder to continue after his death to a designated beneficiary if surviving the decedent.

(2) A contract under which the decedent immediately before his death was receiving or was entitled to receive, together with another person, an annuity, or other stipulated payment payable to the decedent and such other person for their joint lives, with payments thereunder to continue to the survivor following the death of either.

(3) A contract or agreement entered into by the decedent and his employer under which the decedent immediately before his death and following retirement was receiving or was entitled to receive an annuity or other stipulated payment, payable to the decedent for the duration of his life and thereafter to a designated beneficiary, if surviving the decedent, whether the payments after the decedent's death are fixed by the contract or subject to an option or election exercised or exercisable by the decedent.

(4) A contract or agreement entered into by the decedent and his employer under which at decedent's death, prior to retirement or prior to the expiration of a stated period of time, annuity or other payment was

payable to a designated beneficiary if surviving the decedent.

(5) A contract or agreement under which the decedent immediately before his death was receiving or was entitled to receive an annuity for a stated period of time, with the annuity or other payment to continue to a designated beneficiary, upon the decedent's death prior to the expiration of such period, if surviving the decedent.

H.R.Rep.No.1337, *supra*, at A 314–16; S.Rep. No.1622, *supra*, at 469–72, U.S.Code Cong. & Admin.News 1954, pp. 4458, 5114.

**9.** The sole exception is example (4) which omits any requirement of annuity or other payment to the decedent. However, it has been recognized that this example simply cannot be correct unless amplified. See *Estate of Bahen v. United States*, 305 F.2d 827, 834 n. 14, 158 Ct.Cl. 141 (1962), citing Bittker, *supra*, 29 Tul. L.Rev. at 469–70 n. 58 and Pincus, *supra*, 44 Va.L.Rev. at 866–67 (1958). As the Tax Court concluded in *Estate of Fusz, supra*, 46 T.C. at 218, "example 4 in the report of the Senate Finance Committee, in juxtaposition with other statements in the report and the other five [sic] examples, necessarily implies that post-employment benefits payable to decedent during his lifetime were also involved."

might have become totally and permanently disabled had he lived.

■ We do not consider the case to be altered in the Government's favor by the Treasury Regulations. While these contain some broad language, there is nothing to indicate that their framers addressed the problem here presented. The closest of the illustrations is example (6).[10] While we have no quarrel with this, it is inapposite since the payments both to the employee and to the beneficiary were life annuities. Without endeavoring to be too precise, we deem it plain that, in framing the condition on § 2039(a), Congress was not going beyond benefits the employee was sure to get as a result of his prior employment if he lived long enough. Even more plainly Congress was not thinking of disability payments which an employee would have had only a remote chance of ever collecting had he lived. Not only are the disability payments in this case extremely hypothetical, they are also far from the "annuity or other payment" contemplated by Congress. Courts have, consistent with basic principles of statutory construction, recognized that "annuity or other payment" does not mean "annuity or any payment," but that the phrase is qualitatively limited by the context in which it appears. See *Estate of Fusz, supra,* 46 T.C. at 217–18. The Service itself has acquiesced in and furthered this view. See Rev.Rul. 77–183, *supra.* Thus, it seems clear to us that Congress did not intend the phrase to embrace wages, *Estate of Fusz, supra,* 46 T.C. at 217; *Kramer v. United States, supra,* 406 F.2d 1363, 186 Ct.Cl. 684; *Eichstedt v. United States,* 354 F.Supp. 484, 491 (N.D.Cal.1972); possible sickness and accident payments, which were a substitute for wages, Rev.Rul. 77–183, *supra* ; or the disability payments involved in this case, which likewise were a partial continuation of wages when an employee's physical health deteriorated even further. The disability payments theoretically achievable here by the decedent in his lifetime are closer to the sickness benefits which he would have received at an early stage of his illness than they are to post-retirement benefits. The Tax Court's treatment of possible disability benefits as presupposing a post-retirement status linked to the widow's ultimate succession thereto seems to us to be unsupported in fact. *And see* footnote 5.

### III.

The final paragraph of the Tax Court's opinion, 70 T.C. at 705, which we quote in the margin,[11] gives us some reason to think the able judge might have reached the same conclusion as we have if he had not deemed himself bound by authority. Of the cases cited by him, only one, *All v. McCobb,* 321 F.2d 633 (2 Cir. 1963), is binding upon us. We think that he and others have given that decision a significance on the type of issues here presented that is unwarranted,

---

10. *Example (6).* The employer made contributions to two different funds set up under two different plans. One plan was to provide the employee, upon his retirement at age 60, with an annuity for life, and the other plan was to provide the employee's designated beneficiary, upon the employee's death, with a similar annuity for life. Each plan was established at a different time and each plan was administered separately in every respect. Neither plan at any time met the requirements of section 401(a) (relating to qualified plans). The value of the designated beneficiary's annuity is includible in the employee's gross estate. All rights and benefits accruing to an employee and to others by reason of the employment (except rights and benefits accruing under certain plans meeting the requirements of section 401(a) (see § 20.2039–2)) are considered together in determining whether or not section 2039(a) and (b) applies. The scope of section 2039(a) and (b) cannot be limited by indirection.

11. We add a final word. The problem presented by this case is a difficult one, and at least from a purely theoretical point of view the answer is not free from doubt. But there has accumulated in this area a fairly substantial body of decisions, and we do not write upon a clean slate. Petitioner's counsel have ably presented strong arguments in support of their position, and have undertaken to distinguish various cases upon which we rely. However, even if there are possible distinctions as to some of these cases, we are still left with the firm conviction that the dominant thrust of such cases as *Bahen, All, Gray, Hetson, Gaffney, Beal, Wadewitz,* and *Silberman,* requires the conclusion that section 2039 applies to the facts of this case.

and that most of the other cases are also distinguishable.

In *All* the decedent had been receiving annuities under a non-contributory non-qualified annuity plan and a partially contributory, non-qualified supplemental annuity plan of the Standard Oil Company of New Jersey. His widow received twelve monthly payments under a death benefit plan for such annuitants. The case for application of § 2039 would seem almost too clear for argument. The sole claim advanced against this by the taxpayer was that the payments were within the exception for insurance—a claim to which this court gave the short shrift that it deserved. The case thus has simply no bearing on the issue here before us.

The most influential decision on what the decedent must receive or be entitled to receive in order to trigger application of § 2039 is *Estate of Bahen v. United States*, 305 F.2d 827, 158 Ct.Cl. 141 (1962) (Davis, J.). The opinion is indeed a virtuoso performance which has tended to dominate the field to the extent that, with the significant exception of Judge Aldisert's dissent in *Gray v. United States, infra*, 410 F.2d at 1112–14, courts seem to look to the *Bahen* opinion rather than to the statute and the committee reports as indicative of the legislative intent. Beyond all this it is of peculiar importance here since it involved a sum payable only in the event of disability, and the Commissioner quite properly relies heavily upon it.

The case involved payments by the Chesapeake & Ohio Ry. to Mr. Bahen's widow under two benefit plans. Under the more significant, a non-qualified Deferred Compensation Plan applicable only to 40 officers and executives, on Mr. Bahen's death the C. & O. would pay $100,000 to his widow or surviving children in 60 equal monthly instalments; if, prior to retirement, he became totally incapacitated, the payments would be made to him so long as he survived, any amounts unpaid at the time of his death to go to his widow or minor children. Another plan provided that if an employee with more than 10 years service died while in the company's employ and before becoming eligible for retirement, the

company would pay a sum equal to three months salary to his widow or minor children. Mr. Bahen died suddenly while in the railway's employ and before becoming eligible for retirement. The court held that payments to Mrs. Bahen under both plans were includible in the estate since "[e]very requirement [of § 2039] is squarely met, not only in literal terms but in harmony with the legislative aim." 305 F.2d at 829, 158 Ct.Cl. at ——. Most relevantly for our purposes, the court held that the provision for payments to Mr. Bahen under the Deferred Compensation Plan in the event of his disability prior to retirement satisfied the condition of § 2039(a), for the purposes of both payments to Mrs. Bahen, since at the time of his death he possessed the right to receive such payments.

While, as indicated, the case bears some resemblance to ours, there is a different flavor about it, at least so far as concerns the payments under the Deferred Compensation Plan. There was in fact a unitary right to receive deferred compensation of $100,000 in 60 equal monthly payments, this to be paid to Mrs. Bahen if Bahen died or to him if he became totally disabled prior to retirement. There was no question of grouping separate plans together, since both Mr. and Mrs. Bahen's rights were pursuant to the same Deferred Compensation Plan. Even more to the point, if payments were being made to Mr. Bahen due to his disability and he died prior to exhausting the fund, the remaining payments would be made to Mrs. Bahen. In this respect the Deferred Compensation Plan was much like the joint and survivor annuity at which § 2039 was aimed. Here, of course, Mrs. Schelberg had no rights to any payments under the Disability Plan. The possible payments to Mr. Bahen were not, as under IBM's Disability Plan, true disability payments intended to cover a portion of previous salary; they were deferred compensation, as the plan's title indicates, payable by the railway in any event, to be made available to Mr. Bahen at a date earlier than death if his needs so required. They thus met the test laid down in *Estate of Fusz, supra*, 46 T.C. at 217–18, as IBM's disability benefits do not, of being of the same nature

as the payments to the beneficiary. We are not sure that the distinction is sufficient or—what is more or less the same thing—that we would have decided *Bahen* as the Court of Claims did.[12] For the moment we shall leave the matter that way.[13]

The other cases cited by the Tax Court do not require so much discussion. *In re Estate of Wadewitz*, 339 F.2d 980 (7 Cir. 1964), concerned an employment contract under which Wadewitz, the president of a company, was entitled to certain annual sums for a fifteen year period starting with his retirement or the termination of his employment; if he died before the end of the 15 years, remaining payments were to be made to designated beneficiaries. He died in the company's employ before retiring and all payments were made to the beneficiaries. The court nevertheless sustained the Tax Court's holding, 39 T.C. 925 (1963), that Wadewitz had an enforceable right to receive payments, on the ground that he could have accelerated his rights by retiring, as he was free to do at any time. The beneficiary in *Wadewitz*, as in *Bahen* but not the present case, succeeded to the decedent's interest in the same set of payments pursuant to a single, unitary plan. In *Gray v. United States*, 410 F.2d 1094 (3 Cir. 1969), the majority found the condition to § 2039(a) satisfied by the decedent's participation in a retirement plan, taken by the court to be non-qualified, *id.* at 1111–12, under which he had a vested right to annuity payments commencing at age 65, an age he had not reached, or at earlier dates, which were available to him, see *id.* at 1098 n. 4. The decedent's rights to payments were thus not conditional upon such unlikely events as total disability, but merely survival until retirement age; and in any event decedent was actually in a position to receive payments under early retirement options if he had so desired. *Hetson v. United States*, 209 Ct.Cl. 691 (1976), adopted a recommended decision of a trial judge, 75–2 U.S.T.C. (CCH) ¶ 13,098 (1975), that the decedent's entitlement to and receipt of

a "salary" which was payable regardless of the amount of time he devoted to a family company's business and of his ability to do so satisfied the condition in § 2039(a). *Silberman v. United States*, 333 F.Supp. 1120 (W.D.Pa.1971), had been much to the same effect. Finally, *Estate of Beal*, 47 T.C. 269 (1966), seems quite irrelevant. The same plan provided for a provision after retirement and a survivor's death benefit, the decedent had retired and received pension payments, and the case was a paradigm for application of § 2039(a). The upshot is that the decisions in the cases reviewed in this paragraph, as distinguished from their frequent approving citation of and quotation from *Bahen, supra,* furnish no support to the extreme position taken by the Commissioner in this case.

■ We here decide only that to consider a deceased employee's potential ability to have qualified at some future time for payments under a plan protecting against total and permanent disability—a disagreeable feat that had been accomplished as of January 1, 1974, by only a quarter of one percent of IBM's employees—as meeting the condition in § 2039(a) that there must be a contract or agreement under which the decedent received or be entitled to receive "an annuity or other payment", is such a departure from the language used by Congress, read in the light of the problem with which it was intending to deal, as to be at war with common sense. Cf. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). The only decision by which we are bound, *All v. McCobb, supra,* 321 F.2d 633, does not come near to the problem here presented. Of the other decisions cited to us, there are clear grounds of distinguishing all with the possible exception of the leading one, *Estate of Bahen, supra,* 305 F.2d 827, 158 Ct.Cl. 141, and the certain exception of *Gaffney, supra,* 200 Ct.Cl. 744. Although we have been able to distinguish the cases other than *Gaffney* and possibly *Bahen* on grounds that seem to us sufficient,

---

12. This is especially so in regard to "the more difficult question", 305 F.2d at 834, 158 Ct.Cl. 141, in regard to the small amounts payable to Mrs. Bahen under the Death Benefit Plan.

13. The suggested distinction of *Bahen* would not cover *Gaffney v. United States*, 200 Ct.Cl. 744 (1972), but this was simply an order which is not entitled to great precedential weight.

we would not wish to be understood as necessarily agreeing with all of them or with the general approach taken in *Bahen*, see 305 F.2d at 833, 158 Ct.Cl. 141. Some other case may require complete rethinking whether courts, under the influence of the *Bahen* opinion, have not unduly eroded the condition in § 2039(a), as is pointedly suggested by Judge Aldisert's dissent in *Gray v. United States, supra,* 410 F.2d at 1112–14; on the other hand, Congress might decide to cast its net more widely and eliminate or broaden the condition, as it could have done in 1954. We simply decline to carry the erosion of the condition to the extent here urged by the Commissioner.

The judgment is reversed and the cause remanded with instructions to annul the determination of a deficiency.